# SUPERIOR COURT
## OF THE
## STATE OF DELAWARE

PAUL R. WALLACE
JUDGE

NEW CASTLE COUNTY COURTHOUSE
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Date Submitted:  August 25, 2020
Date Decided:  September 18, 2020
Date Corrected: October 1, 2020

Joel Friedlander, Esquire
Christopher M. Foulds, Esquire
Christopher P. Quinn, Esquire Friedlander
& Gorris, P.A
1201 North Market Street, Suite 2200
Wilmington, Delaware 19801

David S. Eagle, Esquire
Sean M. Brennecke, Esquire
Gregory R. Sellers, Esquire
Klehr Harrison Harvey Branzburg LLP
919 North Market Street, Suite 1000
Wilmington, Delaware 19801

Dylan P. Kletter, Esquire
Brown Rudnick LLP
185 Asylum Street
Hartford, Connecticut 06103

RE: *Bobcat North America, LLC v. Inland Waste Holdings, LLC, et al.*
Civil Action No. N17C-06-170 PRW CCLD

Dear Counsel:

Because of this matter's imminent trial date, the Court issues this Letter Order to resolve the Defendants' pending Motion for Partial Summary Judgment (D.I. 190-198) in lieu of a more formal written decision.

## I. INTRODUCTION[1]

This case involves the sale of several waste-management companies (collectively referred to as "Inland") from Defendants Inland Waste Holdings, LLC, Bart A. Begley, Montgomery M. Davison, and Robert A. Smith (collectively, "Defendants" or "Sellers") to Plaintiff Bobcat North America, LLC. The sale was governed by the Unit Purchase Agreement (the "UPA"), executed on the closing date, May 18, 2016 (the "Closing"). As part of the transaction, the parties purchased a Buyer-Side Representations and Warranties insurance policy from QBE Specialty Insurance Company, covering any of Bobcat's losses from Sellers' breaches of their representations in the UPA, including fraudulent breaches (the "QBE Policy").

Bobcat filed this action bringing claims for breach of contract, fraudulent-inducement, negligent misrepresentation, indemnification and declaratory relief. Before the Court is Defendants' Motion for Partial Summary Judgment through which they seek to knock out Bobcat's breach-of-contract, fraudulent inducement, negligent

---

[1] Bobcat has another pending suit in this Court against these same Defendants arising from the same UPA. And this is not the first time the Court has had to address either parties' attempts to seek some form of summary disposition of claims brought in those suits. *See Bobcat North America, LLC v. Inland Waste Holding, LLC,* 2019 WL 1877400 (Del. Super. Ct. Apr. 26, 2019) (deciding Bobcat's earlier motion for partial summary judgment in this case) ("*Bobcat I*"); *Bobcat North America, LLC v. Inland Waste Holding, LLC,* 2020 WL 4757042 (Del. Super. Ct. Aug. 17, 2020) (deciding Defendants' motion to dismiss in the later-filed still-pending suit). And so, the Court writes assuming any reader's familiarity gathered from its prior decisions and adding only the additional factual background needed to address this particular motion.

misrepresentation, and indemnification claims.    For the reasons that follow,

Defendants' Motion is **GRANTED, IN PART,** and **DENIED, IN PART**.

## II.  FACTUAL BACKGROUND

Bobcat is a limited liability company with its principle place of business in

Sarasota, Florida.  George W. Dietrich is Bobcat's Chief Executive Officer.  His son,

William "Billy" Dietrich, is the President.[2]

Inland Waste Holdings is a limited liability company and specializes in

residential and commercial waste management systems and services.  Robert Smith's

father founded Inland and Smith worked for Inland his entire life before selling the

majority of his interest in the company to Monty Davison and Bart Begley at the end of

2012.[3]  Begley and Davison each acquired 37.5% of Inland, and Smith retained 25% of

the equity interest.[4]  Begley acted as Inland's Chief Executive Officer, Davison as its

President, and Smith claims he had no real role in Inland, as he was retired.[5]

---

[2]    *Bobcat I*, at \*2.

[3]    Defs.' Op. Br. in Supp. of Mot. for Partial Summ. J., at 3 (D.I. 190) [hereinafter "Def. Op. Br."].

[4]    *Bobcat I*, at \*2.

[5]    Def. Op. Br., at 3.

In 2015, Begley and Davison decided to sell Inland and retained Livingstone Partners LLC as their investment banker.[6] Bobcat expressed interest in acquiring Inland and starting in October 2015 and continuing until the Closing in May 2016, explored the company.[7] This included formal management meetings, informal interviews of and meetings with all members of Inland's management team, visits to operations and regional offices.[8]

In January 2016, Bobcat and the Defendants signed a formal letter of intent and commenced negotiations.[9] According to Inland, Bobcat had examined the EBITDA for the years of 2015 and 2016 and was on notice that Inland would fall short of its entire year 2016 EBITDA budget.[10] And weeks before the Closing, Bobcat requested a price reduction citing Inland's contractual obligation to the City of Augusta, Georgia, to fund the construction of two CNG facilities.[11] As part of the transaction, Davison, Begley

---

[6] *Bobcat I*, at *2.

[7] Def. Op. Br. at 4; Plf.'s Br. in Opp. to Mot. for Partial Summ. J., at 6–7 (D.I. 206) [hereinafter "Plf. Opp. Br."].

[8] Def. Op. Br., at 4; Plf. Opp. Br., at 7.

[9] *Bobcat I*, at *2.

[10] Def. Op. Br., at 7.

[11] *Id*. at 8, 12.

and Smith received rollover equity in Bobcat in the approximate amount of $3.3 million through their entity RSMDBB Holdings, LLC.[12]  The acquisition was finalized when on May 18, 2016, when Bobcat and Inland entered into the UPA.[13]  In sum, Bobcat purchased Inland through the UPA at a price of $64.9 million.[14]

### A. INLAND'S AUGUSTA CONTRACT LIABILITIES

Inland was obligated to make two $2.65 million payments to the City of Augusta related to the construction of two of the city's CNG filling stations and related infrastructure.  Inland was also obligated to pay other substantial fees and expenses associated with its service obligations over the life of its the contract with Augusta.  In return, Inland was awarded the rights to certain waste collection areas within the city.[15]

Construction of the first CNG station began in 2014 and was not yet complete at the time of Closing.[16]  While construction of the second CNG station had not yet started.[17]  Both Bobcat and Sellers were aware of Inland's obligations to the City of

---

[12] *Id.*

[13] *Bobcat I*, at *2.

[14] *Id.*

[15] Def. Op. Br., at 9–10; Plf. Opp. Br., at 7.

[16] Def. Op. Br., at 10–11.

[17] *Id.* at 11.

Augusta, as evidenced by email exchanges between Dietrich and Davison, and Dietrich and Ryan Franco, a principal of a Bobcat investor.[18]

No UPA provision relieved Inland's successor's obligation to fund the second CNG station or to pay remaining expenses due under Inland's 2015 agreement with the construction manager for the first CNG station.[19] Defendants assert that the Augusta contract was provided to Bobcat and that its effect was fully analyzed, considered, and understood before the Closing.[20] Bobcat alleges that Sellers improperly accounted Inland's contractual obligations owed to the City of Augusta and fraudulently withheld the nature of the liabilities.[21] Further, Bobcat contends that Inland failed to record these liabilities or reflect them in its December 2015 financial statements.[22] This resulted in Defendants understating the Company's liabilities by $5,090,043 (the "Augusta Contract Liabilities").[23] Bobcat also accuses Inland of underreporting certain expenses

---

[18] Trans. Aff. of Sean M. Brennecke in Support of Mot. for Partial Summ. J., Ex. 37–40 (D.I. 191-98) [hereinafter "Brennecke Aff."].

[19] Brennecke Aff., Ex. 31.

[20] Def. Op. Br., at 9–15.

[21] Plf. Opp. Br., at 9–10.

[22] *Id.* at 10.

[23] Plf. Opp. Br. Ex. 7 at 4.

for the Augusta contract by $84,410, causing Inland's 2015 EBITDA to be overstated by the same amount.[24]

## B. BOBCAT'S ENVIRONMENTAL CLAIMS

Bobcat hired ATC, an environmental diligence provider, to perform assessments and compliance reviews of all eight Inland properties.[25] Bobcat, through its 30(b)(6) designee, identified three violations—(1) removal of an underground storage tank in Memphis, (2) a drainage issue in Memphis, and (3) soil contamination in Delaware.[26] And prior to Closing, ATC provided Buyers with cost estimates for potential environmental work at the Inland locations.[27] ATC estimated that "compliance costs" would be $56,800 and estimated in three scenarios the costs of potential remedial work: (i) "Reasonable Best Case": $103,000 - $142,000; "Reasonable Case": $395,000 - $525,000; and (iii) "Reasonable Worst Case": $1,265,000 - $1,395,000.[28] Bobcat

---

[24] *Id.*

[25] Def. Op. Br., at 15–16.

[26] Brennecke Aff., Ex. 47.

[27] *Id.*, Ex. 48.

[28] *Id.*

contends that Inland made false representations with regards to the environmental claims.[29]

## C. THE QBE POLICY

In connection with the UPA, the parties agreed to jointly purchase the QBE Policy to cover certain potential Bobcat losses if there were inaccurate representations and warranties in the UPA. The parties split the cost of the $400,000 premium evenly. The policy covered up to $10 million in damages for any of Seller's breaches of their representations and warranties in the UPA.[30] The UPA divides Bobcat's potential claims against Sellers into two categories: "R&W Insurance Claims" and "Non-R&W Insurance Claims."[31] The R&W Insurance Claims consist of any claim for breach of a representation and warranty that is not classified as a Non-R&W Insurance Claim.[32] According to Defendants' read of the QBE Policy, there are four types of Non-R&W Insurance Claims; two of which the policy covers, two of which it does not.[33] And Defendants suggest that "Fraud claims"—which the UPA defines as "Claims related to

---

[29] Plf. Opp. Br., at 11.

[30] Plf. Opp. Br., at 16; Def. Op. Br., at 22–23.

[31]    UPA § 7.4(b) & (c).

[32] *Id*. at § 7.4(b).

[33] Def. Op. Br., at 23.

any fraud or willful or knowing breach of any representation or warranty"[34]—are a type of Non-R&W Insurance Claim that the QBE Policy covers.[35]

So, Defendants say, under the UPA: (1) Bobcat must submit R&W Insurance Claims to QBE; (2) such claims are subject to a $649,000 deductible; and, (3) Sellers are liable for 50% of any damages for such claims that QBE denied, up to the $10 million policy limit.[36] While Non-R&W Insurance Claims (such as Fraud Claims), Defendants say, are not subject to those limitations.[37]

In September 2016, Bobcat submitted a claim notice to QBE after discovering certain inaccuracies in Sellers' UPA representations and warranties.[38] After Bobcat filed an arbitration action against QBE to enforce its policy, QBE settled with Bobcat in October 2017. In sum, after assessing its risk of insurance liability related to Bobcat's claims, QBE agreed to pay Bobcat $7.1 million.[39] Both sides agree that the Bobcat-QBE's settlement agreement is ambiguous as to how QBE apportioned the settlement

---

[34]     UPA §§ 7.4(b)(1), 10.17(b).

[35]  Def. Op. Br., at 23-24.

[36]  *Id*. at 24.

[37]  *Id*.

[38]  Plf. Opp. Br., at 16.

[39]  *Id*.

across Bobcat's insurance claims. But, Bobcat suggests, how that apportionment breaks down is of no consequence to its claims here. What matters, Bobcat says, is that Sellers' representations and warranties inaccuracies induced it to enter into the UPA.[40]

## III. THE PARTIES' CONTENTIONS

### A. BOBCAT'S COMPLAINT IN THIS CASE

In this suit, Bobcat brings five causes of action against Sellers via its Second Amended Complaint: Count I—Fraud in the Inducement; Count II—Negligent Misrepresentation (in the alternative to Fraud in the Inducement); Count III—Breach of Contract; Count IV—a request for Indemnification; and, Count IV—a prayer for certain Declaratory Relief.[41]

### B. DEFENDANTS' CURRENT MOTION

And through this motion, Defendants now seek:

1. Dismissal of Bobcat's fraudulent-inducement and contract claims insofar as they seek a double recovery of the $7.1 million already received from QBE, because that is prohibited by the UPA and Delaware law;

2. Dismissal of Bobcat's fraudulent-inducement and contract claims concerning allegations of non-GAAP accounting for contractual obligations Inland owed to the City of Augusta, because Sellers disclosed everything about that issue before Closing, and refused

---

[40] *Id.* at 17–18.

[41] D.I. 91.

Bobcat's request for a purchase-price reduction on account of this same issue;

3. Dismissal of Bobcat's fraudulent-inducement and contract claim concerning alleged environmental violations, because Bobcat learned about every such issue from its environmental diligence provider before Closing, chose not to share the information with Sellers even though it knew Sellers were unaware of it, and waited until after the Closing to sandbag Sellers in this lawsuit;

4. Dismissal of Bobcat's fraudulent-inducement claim against Defendant Robert Smith, who retired from Inland at the end of 2012, and against whom no evidence whatsoever exists of any fraud; and

5. Dismissal of Bobcat's claim for negligent misrepresentation, because this Court lacks subject-matter jurisdiction over the claim, and in any event it impermissibly duplicates the breach-of-contract claim.[42]

## C. BOBCAT'S OPPOSITION TO SUMMARY JUDGMENT

Bobcat argues that the QBE payment should not be offset as a matter of law because: (1) the UPA excludes the QBE Payment from Defendants' potentially-available setoff rights; (2) there is a genuine issue of material fact regarding the allocation of the QBE Payment; and (3) even if the UPA did not prohibit setoff, the collateral source rule requires, at most, a 50% setoff.

As for the Augusta contract liabilities, Bobcat further argues there is a genuine issue of material fact about whether Bobcat knew: (1) that the accounting treatment of

---

[42] Def. Op. Br., at 2.

the Augusta Contract Liabilities were not in accordance with GAAP; and (2) that the representation that Defendants recorded the Augusta Contract Liabilities in accordance with GAAP was false. According to Bobcat, even if Defendants contend that Bobcat did not justifiably rely on the representations about the August Contract Liabilities, Bobcat's breach-of-contract claim succeeds.

As for the environmental violations, Bobcat argues there is a genuine issue of material fact regarding whether Bobcat had knowledge of the actual environmental issues and that even if it had actual knowledge, Bobcat's breach-of-contract claim survives.

Next, Bobcat contends there is a genuine issue of material fact as to whether Robert Smith had the requisite scienter to commit fraud.

Lastly, Bobcat suggests that this Court does have subject matter over its negligent misrepresentation claim.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate where the record demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[43] "Summary judgment will not be granted under

---

[43] Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56, 58–59 (Del. 1991).

circumstances where the record reasonably indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances."[44] Unless the Court is reasonably certain that there is no triable issue, it is within the Court's discretion to decline to decide the merits of the case in a summary adjudication, and to remit the parties to trial.[45]

The moving party must establish that the undisputed facts support its claims or defenses; if so, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact to be resolved at trial.[46] And in determining whether there are material issues of fact, the Court must view the facts in the light most favorable to the non-moving party.[47] Where no such genuine issue of any material fact exists, the

---

[44] *Burris v. Penn Mart Supermarkets, Inc.*, 2006 WL 2329373, at *1 (Del. Super. Ct. July 13, 2006) (citing *Ebersole v. Lowengrub*, 180 A.2d 467, 468–69 (Del. 1962)); *see also Cross v. Hair*, 258 A.2d 277, 279 (Del. 1969) ("Moreover, although the record is silent as to the Superior Court's reason for denying the defendant's motion for summary judgment, it needed no more reason than to conclude, upon preliminary examination of the facts, that it found it desirable to inquire thoroughly into all the facts in order to clarify the application of the law.") (citing *Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 919 (Del. 1965)); *Cont'l Ins. Co. v. Rutledge & Co.*, 750 A.2d 1219, 1227–28 (Del. Ch. 2000) ("[T]he Court also maintains the discretion to deny summary judgment if it decides that a more thorough development of the record would clarify the law or its application.").

[45] *Cross*, 258 A.2d at 278.

[46] *Parexel Int'l (IRL) Ltd. v. Xynomic Pharmaceuticals Inc.*, 2020 WL 5202083, at *5 (Del. Super. Ct. Sept. 1, 2020).

[47] *Tanzer v. Int'l Gen. Indus., Inc.*, 402 A.2d 382, 385 (Del. Ch. 1979) (citing *Judah v. Del. Trust Co.*, 378 A.2d 624, 632 (Del. Super. Ct. 1977)).

moving party is entitled to judgment as a matter of law.[48]

## V. DISCUSSION OF DISPUTED CLAIMS

### A. SUMMARY JUDGMENT APPROPRIATE ON THE FRAUD CLAIM (COUNT I).

Defendants argue that Bobcat seek precisely the same damages via its contract and fraud claims.[49] In its expert Report on Economic Damages, Bobcat's expert John O'Donnell concludes that Bobcat overpaid Sellers $26.967 million, or alternatively, $30.6 million.[50] Mr. O'Donnell's opinions supporting those figures make no distinction between contract and fraud damages.[51] Although this Court has certainly had occasion to allow companion fraud and breach-of-contract claims to survive past the motion-to-dismiss stage in certain case, such fraud claims are supported by prayers for recission or rescissory damages.[52] But Bobcat seeks no such damages here. And this Court has

---

[48] *Id*.

[49] Def. Op. Br., at 22.

[50] Brennecke Aff., Ex. 62 at 35.

[51] *See id*. at 28–35.

[52] *See Novipax Hldgs. LLC v. Sealed Air Corp.*, 2017 WL 5713307, at *14 (Del. Super. Ct. Nov. 28, 2017) (finding that a claim for rescission or rescissory damages separates a fraudulent inducement claim from breach-of-contract count); *ITW Glob. Investments Inc. v. Am. Indus. P'rs Capital Fund IV*, 2015 WL 3970908, at *6 (Del. Super. Ct. June 24, 2015) ("Count I for fraud must be dismissed because it pleads damages that are simply a 'rehash' of the breach of contract damages. Because Count II for fraud in the inducement pleads damages for rescission or rescissory damages, the Court will not address Count II."); *see also EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super. Ct. Mar. 21, 2017) (finding that

held consistently that the "mere addition of punitive damages to [a plaintiff's] fraudulent inducement charge is not enough to distinguish it from the contract damages."[53] "Failure to plead separate damages is an independent ground for dismissal."[54] Accordingly, the Defendants' Motion is **GRANTED** as to Count I.

### B. THE BREACH-OF-CONTRACT CLAIM (COUNT III) AND ITS COMPANION REQUEST FOR INDEMNIFICATION (COUNT IV) SURVIVE SUMMARY JUDGMENT.

Defendants argue that, because the factual circumstances underlying Bobcat's insurance claims to QBE are similar to its claims in this action, any payment from QBE necessarily must constitute a double recovery of any damages Bobcat might recover through this litigation.

---

plaintiff's count for fraud in the inducement is materially identical to the breach-of-contract count and rejecting plaintiff's reliance on *ITW* because plaintiff pled neither for rescission nor rescissory damages as did the *ITW* complainant); *AssuredPartners of Virginia, LLC v. Sheehan*, 2020 WL 2789706, at *11 (Del. Super. Ct. May 29, 2020); *Firmenich Inc. v. Nat. Flavors, Inc.*, 2019 WL 6522055, at *4 (Del. Super. Ct. Oct. 29, 2019).

[53] *EZLinks*, 2017 WL 1312209, at *6; *Ashland LLC v. Samuel J. Heyman 1981 Continuing Trust for Heyman*, 2018 WL 3084975, at * 16 (Del. Super. Ct. June 21, 2018).

[54] *EZLinks*, 2017 WL 1312209, at *6 (citing *Cornell Glasgow, LLC v. La Grange Props. LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012) ("[Plaintiff] has failed to plead fraud damages separate and apart from its breach damages. The fraud claim, therefore, must be dismissed for this reason as well.")) and *ITW Glob. Investments*, 2015 WL 3970908, at *5.

Bobcat counters that unlike its insurance claims to QBE, which were allegedly R&W Insurance Claims, it is pursuing Non-R&W Insurance Claims in this action. The UPA differentiates Non-R&W Insurance Claims from R&W Insurance Claims.

In Section 7.4 of the UPA, "Non-R&W Insurance Claims" are defined, in relevant part, as:

(i)  Claims related to any fraud or willful or knowing breach of any representation or warranty of the Company Group, Newco or any Member set forth in this Agreement (the "Fraud Claims");

(ii) Claims related to inaccuracies or breaches of any representation or warranty set forth in Section 3.12(c) (Environmental Matters). . . .

Bobcat contends that its claims in this action all fall under the definition of either Fraud Claims or Environmental Matters and that these Non-R&W Insurance Claims are not subject to liability limitations that apply to R&W Insurance Claims.

Certainly, one read of the myriad documents controlling this complex transaction may be that Fraud Claims are covered by the QBE Policy, while claims regarding environmental matters are not covered by the QBE Policy.[55] And that Bobcat may—

---

[55] *Compare e.g.* UPA, § 7.4(b) *with* Brennecke Aff., Ex. 31 at ALTOS-0023851 (QBE Policy's Exclusions).

but is not required to—submit Fraud Claims to QBE. If so, according to Defendants, Bobcat chose to submit its Fraud Claims to QBE.

Under UPA Section 7.4(c), "R&W Insurance Claims" means any claim made by the Buyer and its Affiliates (including the Company Group after the Closing Date), and their respective members, directors, officers, employees, agents and other representatives (collectively, "Buyer Indemnified Parties") pursuant to Section 7.1(a)—other than any Non-R&W Insurance Claim. Under Article 7, Smith, Begley, and Davidson (identified in the UPA's preamble as the "Members"), Inland Waste Holding (identified therein as "IWH") and RSMDBB Holdings (collectively referred to in Section 7.1 as the "Seller Indemnifying Parties"), are responsible for indemnifying:

> all Claims asserted against, resulting to, imposed upon or incurred by any Buyer Indemnified Party directly or indirectly, by reason of, arising out of or resulting from: (a) any inaccuracy or breach of any representation or warranty of the Company Group, IWH, Newco or any Member contained in or made pursuant to this Agreement (disregarding for the purposes of this Article 7 any qualifications of such representations or warranties relating to "materiality" or "knowledge" or similar language).[56]

These R&W claims have their own regime under the UPA that requires Bobcat to first go to QBE to obtain relief. Specifically, Section 7.4(c)(v) states that Buyers "shall seek

---

[56]    UPA § 7.1(a).

and collect payment related to any R&W Insurance Claim solely from [QBE]."[57] After Buyers seek such payment, if there are R&W Insurance Claims that QBE denied, Bobcat can obtain from Sellers either 50% or 100% of its damages for such denied claims, depending on the type of representation breached, up to the QBE Policy limit of $10 million.[58]

The limitations under Section 7.7 refer to the obligation of Seller Indemnifying Parties for claims under Section 7.1—and those Section 7.1 claims are the R&W Insurance Claims. But Section 7.7 places such no limitations on the Seller Indemnifying Parties' obligations for the Non-R&W Insurance Claims. Under the UPA's plain language, Defendants' argument that it requires the amounts obtained under the QBE Policy to offset these Fraud Claims, a type of non-R&W insurance claim, fails.

It is undisputed that the QBE settlement agreement is silent as to how the QBE payment was allocated across Bobcat's R&W Insurance Claims. Yet, Defendants assume that any damages the Court awards in this case will correspond to the QBE payment on a dollar-for-dollar basis. Not so. There remains in dispute a genuine issue

---

[57]    UPA § 7.4(c)(v).

[58]  *Id.*

of material fact as to if or how the QBE settlement payment should be allocated across Bobcat's insurance claims and its effect on any potential award here.

Undeterred, Defendants argue further that the QBE payment "was based, at least in part, on Sellers' fraud" because: (i) Bobcat's claim notice alleged "knowing" breaches; and (ii) the QBE settlement agreement addresses any subrogation rights QBE may have had against Defendants, which are only available in the case of fraud.

Bobcat suggests that there is contrary evidence that the QBE payment addressed any claims for fraud. As Defendants acknowledge, Bobcat's claim notice clearly identifies the type of claims Bobcat was seeking to recover from QBE: "R&W Insurance Claims."[59] As Defendants also acknowledge, under the UPA, R&W Insurance Claims "includes only non-fraudulent breaches."[60] According to Bobcat, this evidences that it only sought reimbursement of R&W Insurance Claims, so the QBE payment was and should be applied only to those claims.[61]

The QBE settlement agreement expressly covers "the claims set forth in the Claim Notice," which are specifically identified as "R&W Insurance Claims"—not

---

[59] Def. Op. Br., at 27; Brennecke Aff., Ex. 44.

[60] Def. Op. Br., at 27.

[61] Plf. Opp. Br., at 23.

fraud claims.[62]   Bobcat's arbitration demand also contained no allegations regarding knowledge or fraud.[63]

So there is a genuine issue of material fact concerning whether the QBE Payment covered claims for fraud.  And so, the Court cannot grant the summary judgment Defendants' seek.  Any offset now, before the Court even determines if an award of damages is appropriate, would be premature.  No doubt it is not only desirable, but necessary, to inquire more thoroughly into the facts in order to clarify the application of law to these circumstances.  The Court must hear the evidence as to what QBE paid to determine whether or not damages awarded would in fact be duplicative.  Accordingly, Defendants' request for summary judgment to the effect that it is now entitled to offset of the full QBE payment must be **DENIED.**

Moreover, Defendants argue that Bobcat "sandbagged" Defendants as to Count III's breach-of-contract claims because Bobcat:  (1) knew the Augusta Contract Liabilities were not in the financial statements; and (2) knew of the environmental risks from their own due diligence materials.

---

[62]   Brennecke Aff., Ex. 44 (Claim Notice identifying R&W Insurance Claims); *id.*, Ex. 64 (QBE agreement settling claims from Claim Notice); UPA § 7.4(b)(1) (UPA definition of Fraud Claims); UPA § 7.4(c) (UPA definition of R&W Insurance Claims).

[63]   Brennecke Aff., Ex. 63.

But this does not conclusively demonstrate that Bobcat, in fact, knew the disputed representations made in the UPA were false. Bobcat says that it trusted Defendants to make accurate representations as to these issues and bargained for the right to shift the risk of knowing inaccuracy onto Defendants. Whether Bobcat believed that Inland's accounting of the Augusta Contract Liabilities was improper, and therefore believed that the financial-statement representations in UPA Section 3.5(a) were inaccurate are highly fact-sensitive and credibility-based issues inappropriate for resolution via summary judgment.[64] Because the Court when deciding a summary judgment motion "may not weigh qualitatively or quantitatively the evidence adduced on the summary judgment record."[65] Given the extant genuine dispute of material fact, Bobcat's breach-of-contract claim cannot be knocked out on a mere call of "sandbagging."

Accordingly, the breach-of-contract claim (Count III) and its companion indemnification claim (Count IV) shall proceed to trial.

---

[64] *See Amirsaleh v. Bd. of Trade of City of N.Y., Inc.,* 2009 WL 3756700, at *4 (Del. Ch. Nov. 9, 2009) ("Where intent or state of mind is material to the claim at issue-as is the case here-summary judgment is not appropriate."); *see also Cerebus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1150 ("If the matter depends to any material extent upon a determination of credibility, summary judgment is inappropriate. . . . If a trial court must weigh the evidence to a greater degree than to determine that it is hopelessly inadequate ultimately to sustain the substantive burden, judgment is inappropriate.").

[65] *Cerebus*, 794 A.2d at 1150.

C. UNDER THE UPA, SMITH IS JOINTLY AND SEVERALLY LIABLE FOR "FRAUD CLAIMS."

According to Defendants, the Court should dismiss Smith from this case because he has been retired since the end of 2012 and there is no evidence demonstrating that he is liable for damages related to fraud or willful or knowing breach of any representation or warranty. Indisputably, Smith is a "Member,"[66] a "Seller Indemnifying Party,"[67] and a signatory to the UPA.[68] Under Section 7.1 of the UPA, the Seller Indemnifying Parties (which include *all* "Members") are "jointly and severally" liable for indemnifying Bobcat under the agreement for "Fraud Claims." And "Fraud Claims" are defined in Section 7.4(b)(i) as "[c]laims related to any fraud or willful or knowing breach of any representation or warranty of the Company Group, Newco, or any Member set forth in this Agreement."[69] Thus, as a matter of contract, Smith may be jointly and severally liable for any damages related to any fraud or willful

---

[66]     UPA, Preamble.

[67]  UPA § 7.1.

[68]     Brennecke Aff., Ex. 31 at ALTOS-0023789.

[69]  Brennecke Aff., Ex. 31 at ALTOS-0023754.

or knowing breach of any representation or warranty committed by any Defendant.[70] And, notwithstanding Defendants' contrary protestations, there certainly is a genuine issue of material fact as to Smith's actual knowledge of the alleged fraud.

Under Delaware law, "scienter can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth."[71] And, in the case of fraud,"[w]hen an ultimate fact to be determined is one of motive, intention or other subjective matter, summary judgment is ordinarily inappropriate."[72] Here, Bobcat alleges Defendant Smith held a senior position at the Company, had access to all Company records, and had the motive and opportunity to commit fraud. According to Bobcat, Smith explicitly expressed concern regarding "misrepresent[ations]" in connection with "this deal" and raised the alarm that Bobcat might bring a lawsuit against Defendants in connection with "what we are signing."[73]

---

[70] *See AssuredPartners of Virginia,* 2020 WL 2789706, at *7 (finding plain language of transaction agreement to impose joint and several liability among signatories even where one signatory disclaimed involvement in breached provision).

[71] *In re Wayport, Inc. Litig*., 76 A.3d 296, 326 (Del. Ch. 2013).

[72] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I*, LLP, 2017 WL 3168966, at *2 (Del. Ch. July 26, 2017); *see also Continental Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824 (Del. 1969) (same); *Amirsaleh*, 2009 WL 3756700, at *4.

[73] Trans. Dec. of Christopher M. Foulds in Opposition to Mot. for Partial Summ. J., Ex. 2 (D.I. 206).

On this record, the Court cannot grant summary judgment absolving Smith from liability of damages. The Court therefore **DENIES** Defendants' request to dismiss Smith from this case.

### D. THIS COURT HAS NO SUBJECT MATTER JURISDICTION OVER BOBCAT'S NEGLIGENT MISREPRESENTATION CLAIM (COUNT II).

Jurisdiction over the subject matter a claim is an indispensable element in any judicial proceeding, and so, "a threshold inquiry must be made to determine whether a Court has proper jurisdiction over the claim before it."[74] "Whenever a question of subject matter jurisdiction is brought to the attention of the trial court, the issue must be decided before any further action is taken, and the issue of jurisdiction must be disposed of regardless of the form of motion."[75]

It is well-settled that the Court of Chancery has exclusive jurisdiction over a claim of negligent misrepresentation.[76] Yet, this issue continues to arise time and again

---

[74] *Texcel v. Commercial Fiberglass*, 1987 WL 19717, at *2 (Del. Super. Ct. Nov. 3, 1987).

[75] *Texcel*, 1987 WL 19717, at *2.

[76] *Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at * 11 (Del. Super. Ct. Feb. 15, 2013) (citing *State Dep't of Transp. v. Figg Bridge Eng'rs, Inc.*, 2011 WL 5593163, at *4 (Del. Super. Ct. Nov. 9, 2011)). *See Mark Fox Group, Inc. v. E. I. DuPont de Nemours & Co.*, 2003 WL 21524886, at *5 (Del. Ch. July 2, 2003) ("In addition to developing the concept of claims for negligent or innocent misrepresentation, the Court of Chancery has retained exclusive, rather than concurrent, jurisdiction over such causes of action."); *see also WyPie Investments, LLC v. Homschek*, 2018 WL 1581981, at *16 (Del. Super. Ct. Mar. 28, 2018) ("[T]he negligent

in this Court's complex commercial cases. And the Court has been persistently consistent in its approach to claims framed as Bobcat has.[77] Indeed, this Court can hardly have been clearer when putting parties on notice of the impropriety of bringing these claims here: "With such a bright line, counsel would clearly understand the obligation to raise such issues in our equity court and stop including them in contract disputes hoping the Superior Court will decide to keep the claim under the disguise of simple negligence."[78] Or hoping, as Bobcat does, that its fallback position that some specified leave to transfer—not outright dismissal or summary judgment—is the appropriate remedy now.[79]

---

providing of false information relied upon by the claiming party is a matter for the Court of Chancery and not the Superior Court.").

[77] E.g. GEA Systems North America LLC v. Golden State Foods Corp., 2020 WL 3047207, at *6 (Del. Super. Ct. June 8, 2020); Affy Tapple, LLC v. ShopVisible, LLC, 2019 WL 1324500, at *4 (Sel. Super. Ct. Mar. 7, 2019); Optical Air Data Systems v. L-3 Communications Corp., 2019 WL 210543, at *2 (Del. Super. Ct. Jan. 14, 2019); Otto Candies, LLC v. KPMG LLP, 2018 WL 1960344, at *3–4 (Del. Super. Ct. Apr. 25, 2018); *WyPie Investments,* 2018 WL 1581981, at *16; Raytheon Company v. BAE Systems Technology Solutions & Services Inc., 2017 WL 5075376, at *12 (Del. Super. Ct. Oct. 30, 2017).

[78] *WyPie Investments,* 2018 WL 1581981, at *16 (Del. Super. Ct. Mar. 28, 2018) ("[T]he negligent providing of false information relied upon by the claiming party is a matter for the Court of Chancery and not the Superior Court.").

[79] Plf. Opp. Br., at 49–50,

But we are not at the pleading motions stage of this case as in *Otto Candies*[80] (or most other cases addressing this jurisdictional quandry), and Bobcat is not requesting leave to transfer the entire "civil action, suit or [ ] proceeding" so that "[s]uch proceeding may be transferred to an appropriate court for hearing and determination."[81] Nor is Bobcat asking the Court to grant leave to transfer some readily severable and isolated unit of civil action. No, Bobcat after years of litigation here—and with a trial date looming—asks the Court to now cull just that offending count from its Second Amended Complaint and to express in its disposition that Bobcat is "afforded an opportunity to transfer the claim" to the Court of Chancery.[82] Bobcat leaves one to wonder what then will actually happen in these circumstances.

And it is tempting, given the stage of the proceedings, to enter a simple unadorned order of summary judgment on the negligent misrepresentation claim to just

---

[80]    2018 WL 1960344, at *2-3.

[81]    *See* DEL. CODE ANN. tit. 10, § 1902 (2020) ("No civil action, suit or other proceeding brought in any court of this State shall be dismissed solely on the ground that such court is without jurisdiction of the subject matter . . . . Such proceeding may be transferred to an appropriate court for hearing and determination, provided that the party otherwise adversely affected, within 60 days after the order denying the jurisdiction of the first court has become final, files in that court a written election of transfer, discharges all costs accrued in the first court, and makes the usual deposit for costs in the second court.").

[82]    Plf. Opp. Br., at 6, 49–50.

remove it from this litigation in this Court.[83]  But to what end?  Bobcat would try to figure it out from there?  The Court of Chancery, if called upon, would be left to address any attempt by Bobcat to initiate prosecution of the lone claim?

The Court can't do that.  Because the Court can't ignore the language of its own rules—a Rule 56(c) grant requires a finding "that the moving party is entitled to a judgment as a matter of law" and entry of that judgment.  The Court can neither make such finding nor enter any such judgment on a claim over which a sister court exercises exclusive subject matter jurisdiction.  Too, the Court can't ignore both a statute and the manner it has addressed similar circumstances in the past.[84]  The Court can only now lament the fact that Bobcat stands with the many other parties that haven't heeded the Court's admonitions to stop putting it in this jurisdictional and judicial resource-wasting pickle, figuratively shrug its shoulders, and enter an ill-fitting order on that lone count.

---

[83]  *See WyPie Investments,* 2018 WL 1581981, at *16.

[84]  *E.g. Farm Family Casualty Co. v. Cumberland Insurance Co, Inc.*, 2013 WL 5496779, at *3 (Del. Super. Ct. Oct. 3, 2013) (on motion for summary judgment, Court ordered that "Count VII, negligent misrepresentation, and Count VIII, equitable fraud, are ***dismissed without prejudice*** to [plaintiff's] right to transfer the action to the Court of Chancery within 60 days.") (emphasis in original); *Optical Air Data Systems*, 2019 WL 210543, at *2 (Del. Super. Ct. Jan. 14, 2019) (on motion for summary judgment, Court "grant[ed] the Motion as to the [negligent misrepresentation] Counterclaim . . . [and] stay[ed] entry of judgment on the [negligent misrepresentation] Counterclaim for ten (10) days in order to allow [counterclaimant] the opportunity to request transfer of the counterclaim to Chancery Court under 10 *Del.* § 1902").

So the Defendants' motion is **DENIED** insofar as they seek outright dismissal of the negligent representation claim. Bobcat may seek its transfer to the Court of Chancery under 10 *Del. C.* § 1902, or elect to have this Court enter an order of dismissal without prejudice.[85] Bobcat's counsel are to submit, within 10 days: (1) an order on notice; and (2) if transfer is sought, a status report explaining the practical effect of the remainder of this case here.

## VI. CONCLUSION

For the foregoing reasons, this Court **DENIES** the Defendants' Motion as to the breach-of-contract claim (Count III) and the related indemnification claim (Count IV), **GRANTS** the Motion as to the fraudulent inducement claim (Count I), and provides relief as described on the negligent misrepresentation claim (Count II).

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*

Paul R. Wallace, Judge

cc: All Counsel via File and Serve

---

[85] *See Otto Candies*, 2018 WL 1960344, at *4 (granting such relief on motion to dismiss, but notably where the entire case then transferred to—and perhaps bedeviled—the Court of Chancery). *E.g. Otto Candies, LLC v. KPMG LLP*, 2019 WL 994050, at*2-6 (Del. Ch. Feb. 28, 2019) (dismissing plaintiffs' complaint for lack of personal jurisdiction and for failure to state a claim on the fully briefed motion transferred with the case from this Court); *Otto Candies, LLC v. KPMG LLP*, 2019 WL 1856766, at*1 (Del. Ch. Apr. 25, 2019) (court constrained—because of a specific Chancery rule not applicable here—to give plaintiffs "a mulligan" on that dismissal); *Otto Candies, LLC v. KPMG LLP*, 2020 WL 4917596 (Del. Ch. Aug. 21, 2020) (final dismissal of any and all negligent misrepresentation claims).